In the Interest of F.C., III, a minor.

Appeal of F.C., III, Appellant.

Superior Court of Pennsylvania.

Argued Oct. 29, 2008.
Filed Jan. 23, 2009.
Reargument Denied April 2, 2009.

William R. Crum, Jr., Pittsburgh, for F.C., appellant.

Laval S. Miller–Wilson, Philadelphia, Juvenile Law Center, appellant.

Elizabeth L. Hughes, Pittsburgh, for Allegheny County Dept. of Human Services, appellee.

Lynn Reddick, Pittsburgh, participating party.

Christina Kennedy, Pittsburgh, participating party.

Zygmont A. Pines, Philadelphia, participating party.

Thomas W. Corbett, Jr., Attorney General, Harrisburg, participating party.

BEFORE: MUSMANNO, DONOHUE and COLVILLE *, JJ.

OPINION BY COLVILLE, J.:

¶ 1 F.C., a minor, appeals the order committing him to involuntary drug and/or alcohol treatment under 71 P.S. § 1690.112a (commitment of minors, "Act 53"). The issues are: (1) whether F.C. was denied due process when, based solely on a petition for involuntary drug treatment, he was detained and subjected to a drug and alcohol assessment in which he was compelled to divulge private information without first being given notice and an opportunity to test the allegations in the petition; (2) whether his right to counsel was infringed when he was assessed without counsel present; (3) whether he was denied due process by being restrained in shackles prior to and during the hearing to determine his involuntary commitment; (4) whether his right to counsel was infringed during the hearing because, being held in restraints, he could not communicate with his counsel.[1] We affirm.

### Statutory Provisions

¶ 2 The relevant portions of the statutes at issue are as follows:

### § 1690.112a.  Commitment of Minors

(a) A parent or legal guardian who has legal or physical custody of a minor may petition the court of common pleas of the judicial district where the minor is domiciled for commitment of the minor to involuntary drug and alcohol treatment services, including inpatient services, if the minor is incapable of accepting or unwilling to accept voluntary treatment. The petition shall set forth sufficient facts and good reason for the commitment. Such matters shall be heard by the division or a judge of the court assigned to conduct proceedings under 42 Pa.C.S. Ch. 63 (relating to juvenile matters), involving children who have been alleged to be dependent or delinquent.

(b) Upon petition pursuant to subsection (a), the court:

(1) Shall appoint counsel for the minor.

(2) Shall order a minor who is alleged to have a dependency on drugs or alcohol to undergo a drug and alcohol assessment performed by a psychiatrist, a licensed psychologist with specific training in drug and alcohol assessment and treatment or a certified addiction counselor. Such assessment shall include a recommended level of care and length of treatment. Assessments completed by certified addiction counselors shall be based on the Department of Health approved drug and alcohol level of care criteria and shall be reviewed by a case management supervisor in a single county authority.

The court shall hear the testimony of the persons performing the assessment under this subsection at the hearing on the petition for involuntary commitment.

---

\* Retired Senior Judge assigned to the Superior Court.

1.  To support his claims that he was denied due process, F.C.'s brief also sets forth additional legal theories (e.g., Act 53 is unconstitutionally vague; it compromises the neutrality of the court because, during Act 53 hearings, there is no lawyer who advocates the commitment petition but, instead, the court essentially acts as an advocate for the petition while also adjudicating that petition; Act 53 does not afford the minor an opportunity to offer evidence or adequately challenge evidence at the hearing; Act 53 is not narrowly tailored so as to withstand constitutional scrutiny; and Act 53 is unconstitutional because it does not require the minimum confinement necessary to effectuate treatment). These theories were not preserved during or before the Act 53 hearing and, as such, they are waived. *Commonwealth v. Rush,* 959 A.2d 945, 949 (Pa.Super.2008); Pa.R.A.P. 302(a).

(c) Based on the assessment defined in subsection (b), the court may order the minor committed to involuntary drug and alcohol treatment, including inpatient services, for up to forty-five days if all of the following apply:

(1) The court finds by clear and convincing evidence that:

(i) the minor is a drug-dependent person; and (ii) the minor is incapable of accepting or unwilling to accept voluntary treatment services.

(2) The court finds that the minor will benefit from involuntary treatment services.

(3) Where the court decision is inconsistent with the level of care and length of treatment recommended by the assessment, the court shall set forth in its order a statement of facts and reasons for its disposition.

(d) A minor ordered to undergo treatment due to a determination pursuant to subsection (c) shall remain under the treatment designated by the court for a period of forty-five days unless sooner discharged. Prior to the end of the forty-five-day period, the court shall conduct a review hearing in accordance with subsection (c) for the purpose of determining whether further treatment is necessary. If the court determines that further treatment is needed, the court may order the minor recommitted to services for an additional period of treatment not to exceed forty-five days unless sooner discharged. The court may continue the minor in treatment for successive forty-five-day periods pursuant to determinations that the minor will benefit from services for an additional forty-five days.

71 P.S. § 1690.112a.

### § 1690.102.  Definitions

(a) The definitions contained and used in the Controlled Substance, Drug, Device and Cosmetic Act shall also apply for the purposes of this act.

(b) As used in this act:

\* \* \* \* \* \* \*

**"Drug dependent person"** means a person who is using a drug, controlled substance or alcohol, and who is in a state of psychic or physical dependence, or both, arising from administration of that drug, controlled substance or alcohol on a continuing basis. Such dependence is characterized by behavioral and other responses which include a strong compulsion to take the drug, controlled substance or alcohol on a continuous basis in order to experience its psychic effects, or to avoid the discomfort of its absence. This definition shall include those persons commonly known as "drug addicts."

\* \* \* \* \* \* \*

71 P.S. § 1690.102 (footnotes omitted).

### *Facts*

¶ 3 On May 30, 2007, F.C.'s grandmother ("Petitioner") filed a petition seeking to have F.C. involuntarily committed to drug and/or alcohol treatment pursuant to Act 53. The petition stated, "[F.C.] will not go to school and I believe he's doing drugs and he's running away. And he's stealing." Petition, 05/30/07, at 1.

¶ 4 On that same date, the court issued an order appointing counsel for F.C., directing F.C. to undergo a drug and alcohol assessment under § 1690.112a(b)(2), scheduling an evidentiary hearing on the petition for involuntary commitment, requiring F.C. to appear at that hearing, and instructing Petitioner to provide F.C. with a copy of the petition and court order.

¶ 5 It is not clear whether Petitioner served F.C. with the petition and order.

Irrespective of that question, though, F.C. maintains that, on or about June 12, 2007, Allegheny County Deputy Sheriffs took him into custody at his home and transported him to the courthouse for the court-ordered assessment and hearing. The court would later indicate it did not know the exact logistics of how F.C. arrived at the courthouse, but it appears undisputed that F.C. did indeed come to be in the custody of the sheriffs prior to the hearing. While in custody, he underwent the aforesaid drug and alcohol assessment. After the assessment, F.C. was brought in restraints before the court for the hearing to determine whether he should be involuntarily committed.

¶ 6 Before and during the hearing, F.C.'s counsel voiced several challenges, reflected in the issues listed *supra*, to the procedure by which F.C. was ordered and brought to his assessment and to his hearing. The court granted no type of relief in response to any of the challenges. Thereafter, the court took testimony from a Ms. Morgano who had conducted the assessment. F.C.'s counsel stipulated to her qualifications to conduct the assessment. Morgano testified that F.C. had a history of outpatient mental health treatment, had been truant from school, had run away from home, had stolen money from Petitioner, had been "very difficult to contain in the home environment," and had a diagnosis of cannabis dependence. N.T., 06/12/07, at 21. It appears the foregoing history to which Morgano testified was supplied to her entirely or at least largely by Petitioner.

¶ 7 Initially, Morgano provided no specific facts, other than the claimed diagnosis of dependency, evidencing F.C.'s marijuana use. On cross-examination, however, Morgano testified to various particulars that had been provided to her by Petitioner. Morgano explained Petitioner had claimed to observe F.C. while he smelled like marijuana and had glassy eyes. Morgano also testified Petitioner had expressed her belief that, based on her aforesaid observations of F.C., he appeared to use marijuana several times per week.

¶ 8 Also on cross-examination, Morgano testified to what F.C. had told her. He admitted during the assessment that he smoked marijuana every day and sometimes used alcohol. He told Morgano he had been using marijuana for one year. Moreover, the context of the testimony revealed the daily usage rate had persisted throughout the one-year period.

¶ 9 At the conclusion of testimony, the court granted the petition and ordered F.C. committed to inpatient treatment.[2] F.C. later filed this timely appeal.

### Analysis

¶ 10 F.C.'s first two complaints are that he was denied due process and the right to counsel when, based solely on the petition, he was detained and subjected to an assessment in which he was compelled to divulge private information without first being given notice and an opportunity to be heard in order to test the allegations in the petition. We will resolve these issues together.

¶ 11 First, we note that these complaints involve the constitutionality of Act 53. These matters are questions of law and, therefore, our standard of review is *de novo*. *Commonwealth v. Ludwig*, 583 Pa.

2. On that same date, the court issued a written order intended to reflect its decision to commit F.C. The face of the order contained a typographical error, the specifics of which are not now relevant. Due to the typographical error on the face of the order, an amended written order was issued on June 16, 2007. Thus, the June 16th order was merely a clerical correction of the one issued on June 12th.

6, 874 A.2d 623, 628 n. 5 (2005). Our scope of review is plenary. *Id.*

¶ 12 We agree with the trial court that portions of the Mental Health Procedures Act ("the MHPA"), 50 P.S. §§ 7101–7503, provide guidance for an analysis of F.C.'s issues. This premise is particularly so since the Legislature regards drug dependence as a mental illness, sickness or health problem. *See* 71 P.S. § 1690.110. Accordingly, it will be helpful to review the steps that take place under the MHPA.

¶ 13 Under 50 P.S. § 7302 ("Section 302"), a county administrator may issue a warrant requiring a person to undergo an involuntary emergency examination at a treatment facility and directing a peace officer to take such a person to the facility specified in the warrant. The warrant may issue upon reasonable grounds that the person is severely mentally disabled and in need of immediate treatment. 50 P.S. § 7302(a)(1). The term "severely mentally disabled" is defined in detail in the MHPA and, in essence, means the person, as a result of mental illness, poses a clear and present danger to himself, herself or others. 50 P.S § 7301(a).

¶ 14 After being transported to the specified facility, the person is subject to an examination by a physician. 50 P.S. § 7302(b). Depending on the results of the examination (*i.e.*, whether treatment is required), the person is either discharged or treated. *Id.* If treated, the person may not be held involuntarily for more than one hundred twenty hours unless, upon application, the Court of Common Pleas orders extended involuntary treatment. 50 P.S. § 7303 ("Section 303"). If such an application is filed, the court then appoints counsel for the person and, within twenty-four hours of the filing of the application, an informal hearing is held. 50 P.S. § 7303(b). At the start of that hearing, the court informs the person of the purpose of the hearing. 50 P.S. § 7303(c). The informal hearing may result in extended treatment which, at that point, may not exceed twenty days. *Id.*

∎ ¶ 15 The MHPA then provides for possible judicial review of the extended treatment order and/or for additional periods of commitment for increasing amounts of time based on additional hearings. 50 P.S. §§ 7303–05. As the number and length of involuntary commitments increase, so do the procedural safeguards afforded to the committed person in connection with each hearing. *See In re: R.D.,* 739 A.2d 548, 555–57 (Pa.Super.1999) (discussing increased procedural protections such as evidentiary formalities as length of commitment increases).

¶ 16 As is apparent from the foregoing discussion, the initial infringement of liberty interests when the person is transported to a treatment facility, subjected to an involuntary psychiatric examination/treatment and then, perhaps, subjected to an informal hearing for a possible twenty-day commitment, takes place with minimal due process or other constitutional guarantees. For example, although a warrant is required for an involuntary examination, there is no notice or opportunity to test the warrant application before the examination is ordered. Counsel is not appointed for the examination but, rather, is appointed if a petition for continuing treatment beyond one hundred twenty hours is filed. An informal hearing held upon petition for extended treatment beyond one hundred twenty hours takes place within twenty-four hours of when the petition is filed, thus affording the person little or no notice until the start of the hearing itself.

∎ ¶ 17 While the foregoing process provides minimal constitutional protections, it is nevertheless constitutionally

sound in light of the therapeutic/non-punitive intent and short duration of the Section 302 procedures. *In Re: J.M.*, 556 Pa. 63, 726 A.2d 1041, 1046–49 (1999). The increasing procedural protections associated with extended treatment, later hearings, and ongoing commitments under Sections 303–305 then satisfy the increasing demands of due process. *In re: R.D.*, 739 A.2d at 555–56.

¶ 18 The procedures under Sections 302 and 303, designed to facilitate therapy for severely mentally ill persons, are similar to those providing drug treatment under 71 P.S. § 1690.112a. While Section 302 calls for a warrant to be issued after reasonable grounds are presented to a court, Section 1690.112a(a) calls for an order to be issued after "sufficient facts and good reason" are presented by petition to the court. Just as Section 302 does not require the appointment of counsel, or notice and an opportunity to be heard before the warrant issues, neither does Act 53 provide such protections before the assessment is ordered. While the Section 302 warrant directs an involuntary examination by a physician, the Section 1690.112a order directs an assessment by a psychiatrist, psychologist or certified addiction counselor.

¶ 19 We note also that F.C. has not particularized what private information he supposedly divulged during the assessment but, in any event, he certainly has not demonstrated that the assessment invaded his privacy any more than would a psychiatric examination under Section 302.

¶ 20 Section 303 calls for the appointment of counsel and requires a hearing within a mere twenty-four hours of the filing of a petition for extended involuntary commitment of up to twenty days. 50 P.S. § 7303(a), (b). Similarly, Section 1690.112a(b) calls for the appointment of counsel, a hearing, and possible commitment of up to forty-five days.

¶ 21 Just as there is no requirement of notice under Section 1690.112a before the start of the hearing, we observe there is little or no notice that needs to be given under Section 303 before the commitment hearing under that section starts.

■ ¶ 22 Additionally, we note that, under Act 53, the court may not commit a minor to involuntary commitment without proof by clear and convincing evidence that the minor is drug dependent and is incapable of accepting or unwilling to accept treatment. 71 P.S. § 1690.112a(c). Clear and convincing evidence is evidence that is so clear, direct, weighty, and convincing that the factfinder could come to a clear conviction, without hesitating, regarding the facts at issue. *Commonwealth v. Feucht*, 955 A.2d 377, 380 (Pa.Super.2008). This heightened standard of proof provides significant protection to the minor before commitment is ordered.

¶ 23 Finally, as we have observed *supra* that the MPHA provides increasing constitutional protections as the persons are subjected to continuing and increased periods of commitment. Similarly, Act 53 provides for ongoing hearings if the court wishes to recommit the minor to treatment. 71 P.S. § 1690.112a(d). In F.C.'s case, at the end of his first hearing, he was notified that a review hearing on his case would be held on July 24, 2007, some six weeks in the future. Thus, he received notice of that review hearing significantly in advance thereof.

¶ 24 In light of the foregoing, we are persuaded that the MPHA and Act 53 serve similar purposes through similar steps with similar constitutional protections. Just as the MPHA survives constitutional scrutiny, *see In Re: J.M.*, 726 A.2d at 1046–49; *In re: R.D.*, 739 A.2d at 555–57, we find so does Act 53. We are not suggesting that every aspect of the

MHPA and every part of its increasing constitutional protections mirror every aspect of Act 53 and its protections. However, the MHPA and Act 53 are sufficiently analogous that the case law finding the MHPA constitutional leads us to a similar result for Act 53.

¶ 25 In reaching this conclusion by analogy, we note also that considerations of due process involve common-sense reasoning and fundamental fairness. *In re: S.L.W.*, 698 A.2d 90, 94 (Pa.Super.1997). Moreover, due process is a flexible concept incapable of exact definition, and is concerned with the procedural safeguards demanded by each particular situation in light of the legitimate goals of the applicable law. *See id.; Corra v. Coll*, 305 Pa.Super. 179, 451 A.2d 480, 482 (1982). Given Act 53's important goal of facilitating treatment for drug-dependent minors, and given the dangers posed to minors and those around them when those minors abuse drugs, a common-sense analysis leads us to conclude the procedures under Act 53 are fundamentally fair and provide constitutionally adequate protections for minors subject thereto. The prerequisite of a court-ordered assessment upon sufficient facts and good reason, an assessment conducted by a qualified person, the appointment of counsel, an in-court hearing requiring clear and convincing evidence prior to involuntary commitment, and the provision for ongoing review before recommitments all examples of ways in which the minor's rights are protected. In short, F.C. has simply not convinced us the statute violated his due process rights or his right to counsel.

¶ 26 F.C. next argues it was a due process violation for him to be restrained prior to and during his hearing. He suggests the due process violation arose because the restraints, being visible, rendered his hearing unfair. At the same time, he also seems to complain the restraints were improper merely because this matter is a civil case, not a delinquency or criminal hearing. We will address these matters together.[3]

¶ 27 While this case is not a criminal matter, the law concerning criminal defendants who are restrained in or near the courtroom is nonetheless a helpful starting point. Generally, due process guarantees defendants the right to appear in court free of restraints. *Commonwealth v. Mayhugh*, 233 Pa.Super. 24, 336 A.2d 379, 381 (1975). This right arises, at least in part, because the appearance of restraints can fix in the jurors' minds prejudice against the defendant. *Id.* at 382.

¶ 28 Even still, defendants may be restrained to prevent escape, to protect others in the courtroom and/or to maintain order in the courtroom. *Commonwealth v. Cruz*, 226 Pa.Super. 241, 311 A.2d 691, 692 (1973). The decision to restrain a defendant in such cases rests in the court's discretion. *Id.* Additionally, the jurors' brief observation of a defendant in physical restraints, particularly if the defendant is observed outside of the courtroom, does not necessarily render the trial so unfair as to require a mistrial. *Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790, 802 (2007).

---

**3.** These arguments are not statutory matters because the statute does not require that the minor be restrained. Rather, these complaints go to the procedures employed by the deputy *sheriffs* and permitted by the court with respect to F.C. According to F.C.'s brief and the court's opinion, it appears the Alle-gheny County Court of Common Pleas may have adopted new procedures regarding the way in which Act 53 assessments and/or hearings are conducted. The new procedures are of no concern to us with respect to the instant case.

¶ 29 The foregoing principles provide a perspective from which to analyze the instant case. Had the instant matter been a criminal trial involving a jury, F.C. might well have a prevailing argument that he was denied due process. However, this matter did not involve a jury. It involved a judge. We think it fair for this Court to take notice that, every day in Common Pleas courtrooms, judges who are about to act as factfinders in criminal trials see defendants escorted into courtrooms while restrained. Of course, the defendants are then most often freed of the restraints for the duration of the trial. Nevertheless, the factfinding judges have already seen those defendants in restraints in their respective courtrooms. Just as we see no reason to believe that a judge's initial observation of a defendant in restraints somehow renders that judge incapable of then acting as a fair factfinder, so too we find no reason to believe the instant judge's initial observation of F.C. in restraints rendered the judge incapable of adjudicating this matter fairly. More to the point of F.C.'s argument, there being no reason to find that the court's initial observation of F.C. in restraints biased the court, we likewise find no reason to conclude that the court would have inexplicably become biased in the short course of the relatively brief hearing that followed. Phrased differently, the court was quite aware at the outset of the hearing that F.C. was restrained, the record does not show the court was biased by that knowledge, and F.C. does not persuade us that the court somehow later became biased by F.C.'s continued restraint for what appears to have been a comparatively brief hearing.

¶ 30 In this vein, we observe that, initially, the court believed the hearing would last only five or ten minutes. While the length of the transcript (i.e., forty-six pages of combined argument and testimony) suggests the hearing did last longer than the anticipated period of time, the transcript does not suggest that the hearing was a particularly extended one relative to many other hearings of which this Court is aware. Rather, the proceedings appear to have been comparatively brief. We are simply unpersuaded F.C. was prejudiced by being restrained during those relatively short proceedings. As such, he has not shown us that his hearing was unfair.

¶ 31 Additionally, the court expressed its concern that F.C. was a flight risk. In doing so, the court referenced without specifying one or more off-the-record discussions regarding the possibility of flight. On the one hand, F.C. did not seem to dispute that such discussions occurred. On the other hand, as we do not consider facts not of record, we have no basis to evaluate the significance of whatever discussions may have taken place. See Commonwealth v. Wrecks, 931 A.2d 717, 722 (Pa.Super.2007) (indicating this Court can only consider facts of record). However, the record does indicate F.C. was known to run away from home. Moreover, the court also indicated that, in its experience, Act 53 hearings carried with them the risk of flight by the minors. Accordingly, we think the court's comments reveal a reasonable design to ensure F.C.'s compliance with the court's order of May 30th requiring that F.C. appear, and therefore remain, for the hearing. Thus, although this matter was not a delinquency or criminal case, the restraints were justified by the court's need to keep F.C. in the courtroom and thereby maintain order.

¶ 32 In sum, F.C. has not convinced us the court's exercise of discretion in keeping him restrained infringed his due process rights. Therefore, he is entitled to no relief on this claim.

.

¶ 33 In his last issue, F.C. also argues, to some extent, that the restraints impeded his ability to communicate with his counsel and thereby infringed his right to counsel. The record indicates the court considered this matter and observed that F.C. and his counsel were able to communicate. There is nothing in the record to suggest the court was wrong. Moreover, F.C. offers us no specifics or elaboration as to how the restraints did in fact interfere with his right to counsel. Accordingly, we are unconvinced by F.C. and, as such, his claim must fail.

¶ 34 Based on the foregoing discussion, we affirm the court's order involuntarily committing F.C.

¶ 35 Order affirmed.